**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO
The Honorable Michael E. Romero**

| | |
|---|---|
| In re: ) | |
| ) | Case No. 06-18082 MER |
| JAMES CHARLES VAUGHN ) | |
| ) | Chapter 11 |
| Debtor. ) | |
| ) | |
| ) | |
| JAMES CHARLES VAUGHN ) | Adversary No. 08-1095 MER |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES OF AMERICA, ) | |
| INTERNAL REVENUE SERVICE, ) | |
| ) | Signed/Docketed |
| Defendant. ) | December 28, 2011 |

**ORDER**

      This matter involves the rise and fall of James Vaughn, an obviously intelligent man who made an extremely unintelligent decision.  Through hard work and entrepreneurial talent, he gained experience in the options trading, venture capital, and cable television industries, rising to executive positions in several companies.  In 1995, he started a successful cable company and began acquiring small cable companies with an eye to selling to a larger entity.  The venture was sold in 1999 for a gross sales price of $2.1 billion, of which Mr. Vaughn received approximately $34 million in cash and stock.  Sadly, this inspiring business success story then took a very negative turn when Mr. Vaughn made the investment which forms the subject of this action.

**JURISDICTION**

      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(a) and (b) and 157(a) and (b).  This is a core proceeding under 28 U.S.C. § 157(b)(2)(I) as it concerns the dischargeability of a particular debt.

## **BACKGROUND FACTS**[1]

The Plaintiff in this action, James Charles Vaughn ("Vaughn"), graduated from high school in 1962. He completed some college courses, but did not earn a degree. Vaughn gained significant experience in business by working with several companies, primarily in the cable television industry. During the 1980s and 1990s, he served as the senior vice president of Triax Communications, a cable company, and was involved in budgeting, financial review, capital raising, acquisitions, and complex negotiations. During the time Vaughn was with Triax, it grew from 30,000 subscribers to approximately 400,000 subscribers. In addition, early in his career, Vaughn began trading options and options futures. As he gained experience, he developed an understanding of the mechanics of investments.

In 1995, Vaughn started Frontier Vision Partners ("Frontier Vision"). He borrowed $500,000 from JP Morgan to start up the company. JP Morgan later invested an additional $25 million in the venture. Frontier Vision raised additional capital through Vaughn, JP Morgan agents, and from presentations to investors. Vaughn explained Frontier Vision's business model was to become a world cable television acquirer, with the intent to buy smaller companies and eventually sell them to a larger entity. To that end, Frontier Vision purchased rural cable television providers and consolidated them into a single provider.

When Frontier Vision began in 1995, it hired the international accounting firm KPMG, LLP ("KPMG") to review acquisition agreements, handle tax preparation and audit activities, document public bond offerings, and perform related services. Vaughn hired Mr. Jack Koo ("Koo"), an experienced commercial banker, as Frontier Vision's chief financial officer. Mr. James McHose ("McHose"), a certified public accountant previously employed by KPMG as a senior tax manager, was also hired by Frontier Vision as vice president and treasurer.

In early 1999, Frontier Vision was sold to Adelphia Communications Corporation ("Adelphia"). From the sale, Vaughn received approximately $20 million in cash and $11 million in Adelphia stock. Koo also received significant cash and Adelphia stock from the sale.

Vaughn knew he would realize capital gains from the sale of Frontier Vision in excess of $30 million. Thus, after the sale was announced, McHose arranged meetings with financial advisors for Vaughn and Koo to suggest investment and tax strategies addressing their profits from the sale. In two meetings with KPMG partner Gary Powell ("Powell"), a product called Bond Linked Issue Premium Structure ("BLIPS") was presented as an investment possibility. The BLIPS product was offered by a company known as Presidio Advisory Services, LLC ("Presidio"). In August 1999, Vaughn, as a potential investor, was issued a "Confidential Memorandum" which described the BLIPS program in detail.

---

[1] The background facts in this Order are taken from the testimony at trial, as well as exhibits and designated portions of depositions presented by the parties. In order to avoid a distracting number of footnotes, the Court will only insert a citation in reference to a specific document or where clarification is needed.

A.      The BLIPS Program

In the Confidential Memorandum, Presidio described BLIPS as a three-stage, seven-year program comprised of investment funds, or investment pools. The first stage, to last 60 days, involved relatively low risk strategies, while the second stage, lasting 120 days, and the third stage, lasting six and one-half years, increased the risk on the investment with the potential for higher returns. Investors, known as Class A members, could withdraw from the program after the first 60 days.[2] In general, this strategy focused on investing in foreign currencies, including currencies "pegged" to the United States dollar.[3] Specifically, these funds, in which a Class A member could invest through creation of a separate investment entity, would "invest in U.S. dollar and foreign currency denominated debt securities of corporate and governmental issuers and enter into forward foreign currency contracts, options on currencies and securities and other investments. . . ."[4] Stated simply, this was an investment which could make money based on the volatility of foreign currencies.

What made BLIPS a "tax strategy" was how the investment was to be funded. Generally, an investor would contribute a relatively modest amount compared to the amount ultimately invested. The balance of the investment would be funded through a loan. The loan would be somewhat unconventional because it would charge a high rate of interest and also carry what was referred to as an "initial unamortized premium amount," or loan premium. The loan premium created a lower, "market rate" of interest, by doing the following three things: 1) amortizing the loan premium; 2) paying interest on the loan amount; and 3) paying interest on the premium itself. Stated differently, while the aggregate of the loan and the loan premium was owed, the premium was being amortized as the loan went forward.[5]

The more important aspect of the investment would be the basis claimed by the taxpayer for such an arrangement. Under the BLIPS program, the taxpayer would claim a basis of the total amount contributed to the investment less the stated principal amount of the loan. As a result, the loan premium is added to the initial investor contribution. Thus, gains are protected by the high basis or, alternatively, in a case where a tax loss may be attractive, for a relatively

---

[2] Joint Exhibit 3, Confidential Memorandum, pp. 7-8 and p. 15.

[3] Joint Exhibit 3, Confidential Memorandum, pp. 8-9.

[4] Joint Exhibit 3, Confidential Memorandum, p. 4 "Executive Summary."

[5] Testimony of Dr. David DeRosa ("DeRosa"). To show how this would work, DeRosa posited an investor who borrows $100 for a year at 6% simple interest, where the interest at the end of the loan term is thus $6, and the investor would owe $106 at the end of the year. If, on the other hand, the investor borrowed $60 for one year at 76.67% interest, and received a $40 premium, the interest at the end of the loan term would be $46, and the investor would owe $106. In each case, the investor receives $100 and owes $106 at the end of the year. According to DeRosa, the loan Vaughn received follows the same model as the second example, but over seven years rather than one year. See Internal Revenue Service ("IRS") Exhibit NNNNN.

little actual cash outlay, a claimed basis could result in a high tax loss "even though the taxpayer has incurred no corresponding economic loss."[6]

**B. The Investment**

In July 1999, following their receipt of the Confidential Memorandum, Vaughn and Koo met with David Makov and Robert Pfaff of Presidio to discuss investments involving the Argentine Peso and the Hong Kong Dollar. The investments were to be accomplished through the creation of a fund called Sill Strategic Investment Fund ("Sill"), to which entities created by the individual investors would contribute funds through an account at Deutsche Bank AG ("Deutsch Bank"). Deutsche Bank would then provide loans for investments in the foreign currency markets through the BLIPS program.

Vaughn chose to invest in the BLIPS program, and in furtherance of this decision created an entity known as Pilchuck Ventures, LLC ("Pilchuck"). On October 7, 1999, pursuant to Presidio's instructions, Vaughn wired $2.8 million to the Pilchuck account at Deutsche Bank to commence the BLIPS transaction.[7] In Vaughn's case, the corresponding loan from Deutsche Bank would be $66 million, plus a $40 million "premium."[8]

Vaughn received closing documents to be reviewed, signed, and returned.[9] The credit documents with Deutsche Bank were dated October 13, 1999. Sill was set up on October 22, 1999.[10] Presidio's letter to Vaughn of October 26, 1999 indicated Sill received contributions from Pilchuck on October 22, 1999 in a total amount of $109.5 million, which included the $2.8 million supplied by Vaughn and the amount loaned by Deutsche Bank.[11] On October 22, 1999, Deutsche Bank sent confirmation notices showing transactions involving approximately $107 million, primarily purchases of Argentine Pesos and Hong Kong Dollars.[12] [13]

---

[6] IRS Exhibit UUU, Internal Revenue Bulletin Notice 2000-44 , p. 255.

[7] Joint Exhibit 5.

[8] See Joint Exhibit 7H, formation documents for Pilchuck, p. 9, approving credit agreement with Deutsche Bank; Joint Exhibit 7B, Credit Agreement between Pilchuck and Deutsche Bank; and IRS Exhibit C, noting a $1 million loan premium assigned for each $700,000 contributed by an investor.

[9] See Joint Exhibits 7A-7L.

[10] Joint Exhibit 8.

[11] Joint Exhibit 12.

[12] Joint Exhibits 9, 10, and 11.

[13] Sill then proceeded to change the interest rate structure by engaging in a "swap" derivative transaction with Deutsche Bank, which lowered the rate to the more conventional London Interbank Offer Rate ("LIBOR") common in financial markets. Thus, Sill received, at least on paper, the 17.694 % times $66.7 million, that is, the $66.7 million plus the $40 million. Since, following the swap, Sill had to pay LIBOR on the whole indebtedness, it

On December 9, 1999, Vaughn received a report from Presidio showing a Pilchuck loss, as of December 8, 1999, of approximately $280,000.[14] Thereafter, as planned, Vaughn "pulled out" of the investment after approximately 60 days.[15] After deduction of fees and interest, Vaughn received approximately $900,000 back from his initial $2.8 million investment, comprised of U. S. dollars, Euros, and Adelphia stock.[16]

The large losses in the BLIPS transactions were generated because Pilchuck (and its sole owner, Vaughn) received only approximately $900,000 in returns on its investment, on a cost basis equal to the amount originally contributed by Vaughn, $2.8 million, plus the loan premium of $40 million, for a basis of approximately $43 million. Thus, a tax loss of approximately $42 million could potentially have been generated by this "investment."

## C.   The Tax Problem

Thereafter, Lees prepared Vaughn's 1999 tax return.[17] This return reflected certain of the losses generated by the BLIPS investment. According to Lees, he relied on the opinions of KPMG and the law firm of Brown & Wood in taking a loss on that return.[18] While Vaughn acknowledged the purpose of BLIPS was to generate losses to him of approximately $40 million, he noted the loss taken on his 1999 tax return did not reflect any real hard dollar loss to anybody at the time the return was filed. In fact, he had no actual losses in the amount claimed when the deduction was taken. He admitted he did not take the full amount of the BLIPS losses on his 1999 tax return. He did take sufficient tax losses to result in his reporting only a $2.4 million

---

becomes apparent the transaction is really a simple loan at LIBOR interest on $106.7 million. Because Sill was able to swap the 17.694 % interest rate for interest at LIBOR, DeRosa stated the only purpose for the initial 17.694 % interest rate was to amortize the $40 million and pay interest at market levels. Thus, after the contribution by Pilchuck, Sill now had a bargain rate, LIBOR, plus the $2.8 million put in by Vaughn, but the actual funds were still, and always were, physically held by Deutsche Bank.

[14]   Joint Exhibit 13.

[15]   See IRS Exhibit HH, consisting of a letter from KPMG employee Robert Lees ("Lees") to Vaughn, dated December 16, 1999, confirming their discussion in which Vaughn directed KPMG to take steps to withdraw Pilchuck from Sill, and a withdrawal request signed by Vaughn and dated December 10, 1999.

[16]   Vaughn initially stated he did not authorize the purchase of Adelphia stock as part of the ending of the BLIPS transaction, but, upon review of his earlier deposition testimony, concluded he misspoke.

[17]   IRS Exhibit V.

[18]   As part of the promotion of BLIPS, KPMG provided a "more likely than not" opinion letter to investors, in which KPMG stated its belief it was more likely than not the IRS would accept the validity of the investment program. On March 23, 2000, Powell sent Vaughn ten pages of KPMG's opinion letter; after Vaughn had signed off on those pages, Powell provided the full opinion letter, dated December 31, 1999. Further, for an additional fee of approximately $50,000, Vaughn also received a similar opinion letter from the law firm of Brown & Wood, a firm engaged by KPMG, dated December 31, 1999. Joint Exhibit 19. However, Powell did not send Vaughn the Brown & Wood letter until May 24, 2000.

capital gain from the sale of Frontier Vision. However, he denied Powell instructed him to take less than the full loss to avoid arousing any IRS suspicions.

On September 5, 2000, the IRS issued Internal Revenue Bulletin Notice 2000-44 addressing tax avoidance using artificially high basis.[19] That Notice stated in part:

> Under the position advanced by the promoters of this arrangement, the taxpayer claims that only the stated principal amount of the indebtedness, $2,000X in this example, is considered liability assumed by the partnership that is treated as a distribution of money to the taxpayer that reduces the basis of the taxpayer's interest under § 752 of the Internal Revenue Code. Therefore, disregarding any additional amounts the taxpayer may contribute to the partnership, transaction costs, and any income realized or expenses incurred at the partnership level, the taxpayer purports to have a basis in the partnership interest equal to the excess of cash contributed over the stated principal amount of the indebtedness, even though the taxpayer's net economic outlay to acquire the partnership interest and the value of the partnership interest are nominal or zero. In this example, the taxpayer purports to have a basis of $1,000X (the excess of cash contributed ($3,000X) over the stated principal amount of the indebtedness ($2,000X)). On disposition of the partnership interest, the taxpayer claims a tax loss with respect to that basis amount, even though the taxpayer has incurred no corresponding economic loss.[20]

KPMG determined BLIPS investors should be contacted regarding the Notice. Specifically, Mr. Jeffrey Eischeid, a KPMG employee, through an email to Powell dated October 3, 2000, provided a script to be used in conversations with such clients and specifically identified Vaughn and Koo as investors who should be contacted.[21] Vaughn did not recall attending a meeting with representatives of KPMG regarding Notice 2000-44, but Lees thought there may have been such a meeting on January 21, 2001, and remembered KPMG representatives continued to insist the transaction was legitimate and would back the transaction and fight the IRS on its interpretation.[22] It is not clear whether, in any such meeting, Vaughn was informed of the increased likelihood of audit or the increased possibility KPMG would be required to provide to the IRS the names of clients engaged in transactions similar to those described in the Notice.[23]

---

[19] IRS Exhibit UUU.

[20] *Id.*, p. 255.

[21] Vaughn Exhibit 24.

[22] Joint Exhibit 20.

[23] See also Vaughn Exhibit 27, Memorandum of Oral Advice, dated March 25, 2002, signed by Tracy Henderson, another KMPG employee, commemorating the January 2001 meeting with Powell, Koo and Vaughn. Vaughn could not remember this meeting; however, he points out the Memorandum does not contain the paragraph in the script provided to Powell on October 3, 2000, indicating such probabilities had been discussed.

On February 6, 2001, Lees sent a letter to Vaughn containing a copy of Notice 2000-44. Vaughn could not remember receiving this document.

On February 6, 2002, Victoria Sherlock ("Sherlock"), a KPMG in-house attorney, met with Koo and Vaughn to discuss an IRS settlement initiative, Notice 2002-2. Sherlock represented Koo, who had received an audit letter from the IRS in 2001 regarding his BLIPS investment. Koo stated he had not had much contact with Vaughn during 2001, and first informed him of his audit letter at the February 6, 2002 meeting. At this meeting, Sherlock, without making a representation about whether she believed BLIPS would ultimately result in additional taxes, informed Vaughn he should disclose his participation in BLIPS to the IRS.[24] Vaughn's disclosure was provided to the IRS on or about March 28, 2002.[25] Vaughn also provided other information requested by the IRS, and agreed to extensions of the statute of limitations to allow the IRS to continue its investigation concerning the losses on his 1999 tax return.

In May 2002, Vaughn and his then-wife Cindy Vaughn received letters from the IRS scheduling an appointment to examine their 1999 tax returns.[26] On March 18, 2004, Lees filed amended tax returns for the Vaughns for 1997, 1998 and 1999, adding a net operating loss carry-back incurred by Vaughn in 2003.[27]

On May 24, 2004, the IRS issued Announcement 2004-46, the so-called "Son of Boss Settlement Initiative."[28] Vaughn asserts he was aware by this time of misrepresentations and omissions made by KPMG and Presidio, through conversations with his attorney, with Koo and through review of a widely-known Senate Subcommittee Report critical of investment vehicles such as BLIPS.[29] Specifically, Vaughn claims KPMG and Presidio hid information from their clients, made misrepresentations about the economic substance and leverage in investments, and misrepresentations about the validity of opinion letters. Vaughn mailed a Notice of Election to Participate in the Announcement 2004-46 Settlement Initiative on June 21, 2004. On June 24,

---

[24] Sherlock Deposition, pp. 54 and 67.

[25] Joint Exhibit 25.

[26] Joint Exhibit 26.

[27] IRS Exhibit XX.

[28] Vaughn Exhibit 47, IRS Announcement 2004-46, "Son of Boss Settlement Initiative." The essence of this proposal by the IRS was to resolve the transactions described in IRS Notice 2000-44, like BLIPS, by allowing taxpayers to concede tax benefits from the transactions, including basis adjustments, and to treat their net out of pocket costs as either long term capital losses or ordinary losses. Taxpayers who participated in the initiative were required to make full payment of the liabilities under the initiative by the date the agreement with the IRS was executed.

[29] Vaughn Exhibit 38, United States Senate Report entitled "U.S. Tax Shelter Industry: The Role of Accountants, Lawyers, and Financial Professionals–Four KPMG Case Studies: FLIP, OPIS, BLIPS, and SC2".

2004, Vaughn received a notice of deficiency showing taxes for the tax year ended December 31, 1999, in the sum of $8,617,902 ("the 2004 Assessment").[30] He could not pay these taxes within thirty days, and so could not meet the eligibility requirements of the Settlement Initiative.[31]

On November 3, 2006, Vaughn filed his Chapter 11 petition (the "Petition Date"). The IRS filed a proof of claim for $14,359,592 as a general unsecured claim, stating at that time the taxes were not entitled to priority under 11 U.S.C § 507(a)(8)(A)[32] because they were assessed more than 240 days before the Petition Date. Almost a year after the Petition Date, and three years after the 2004 Assessment, the IRS realized its error. On October 29, 2007, the IRS abated the 2004 Assessment as unlawful, and on April 10, 2008, the IRS filed its amended proof of claim, asserting the taxes were entitled to priority.

## ISSUES AT TRIAL AND THE PARTIES' POSITIONS

Before the Court is the determination of the dischargeability of the 2005 assessments for the 1999 and 2000 taxes.[33] Critical to this determination is whether Vaughn 1) made a fraudulent return; or 2) willfully attempted in any manner to evade or defeat tax for years 1999 and 2000, pursuant to § 523(a)(1)(C).

Vaughn seeks a finding the taxes assessed against him prepetition, which were abated postpetition and which will be reassessed postpetition, are dischargeable under §§105, 523(a), and 507(a)(8). Specifically, Vaughn alleges KPMG and its agents abused their fiduciary relationship with Vaughn by approaching and pressuring him to invest in BLIPS. Vaughn further asserts because of Koo's financial expertise, he reasonably relied on Koo's advice and representations by KPMG, Koo, and attorneys engaged by KPMG. Vaughn thus did not perform

---

[30] Joint Exhibit 29. The liability was the result of conclusion of the IRS that the claimed basis for Vaughn's BLIP investment was too high–the $40 million loan premium should not have been included because that obligation was taken over by Sill and never represented funds paid by Pilchuck or Vaughn. See IRS Exhibit UUU, p. 3, IRS Notice 2000-44, "Tax Avoidance Using Artificially High Basis." As noted above, this Notice describes an example similar to the BLIPS transaction described here, and notes the taxpayer would claim a basis of the total amount contributed to the investment (in this case, $106.7 million) less the stated principal amount of the loan (in this case $66.7 million) for a basis (in this case $44 million) "even though the taxpayer has incurred no corresponding economic loss." The Notice goes on to state the purported losses from such a transaction "do not represent bona fide losses reflecting actual economic consequences as required for purposes of [26 U.S.C.] § 165."

[31] Vaughn Exhibit 45, IRS Announcement 2004-46 p.2.

[32] Unless otherwise noted, all future statutory references in the text are to Title 11 of the United States Code.

[33] The Court's record reflects the IRS's tax claim arises from unpaid taxes for 1999 in the amount of $8,617,902, and for 2000 in the amount of $119,928.

much, if any, personal due diligence of the BLIPS program.[34] When Koo determined there was economic substance to the BLIPS investment, and based on KPMG's promises, Vaughn invested. Finally, he notes he was also distracted by his wife's serious medical problems at the time.

Vaughn contends KPMG committed fraud because it misrepresented the nature of the BLIPS transaction and did not timely provide promised opinion letters–not until after the investment was made.[35] In addition, Vaughn asserts KPMG knew the investments and that it was being investigated by the Senate for its involvement in the BLIPS program, but did not timely disclose this information to him. Vaughn therefore states he did not willfully evade taxes either through the filing of his tax return or his actions following the filing of the tax return because he was counseled by KPMG that the transaction was legitimate and would ultimately be approved by the IRS.

The IRS asserts the tax assessments are nondischargeable under § 523(a)(1)(C). According to the IRS, Vaughn willfully attempted to evade his tax obligations for 1999 and 2000, and filed fraudulent returns for those years. The IRS states Vaughn knew or should have known, and in reckless disregard of the information that would have informed him, that BLIPS provided him with no reasonable opportunity to earn a reasonable pre-tax profit. He also knew or should have known BLIPS would not survive IRS scrutiny. The IRS contends Vaughn and Koo were too sophisticated to believe BLIPS was legitimate.

Moreover, in contrast to Vaughn's arguments, the IRS points out on March 24, 2000, Vaughn signed off on the draft opinion letter to Pilchuck which KPMG planned to issue regarding BLIPS.[36] The cover letter to the draft, signed by Gary Powell, directed Vaughn to sign the last page of the draft indicating Vaughn had read the draft letter and agreed with its contents. The IRS states Vaughn's representations in this letter were false, and Vaughn knew the BLIPS investment had no reasonable prospect for earning a pre-tax profit, and, contrary to the letter, there was no economic reason for borrowing funds from Deutsche Bank at an excessive interest rate.

---

[34] Vaughn admitted the following key language in KPMG's engagement letter was incorrect: "Client [Vaughn] has independently determined that there is a reasonable opportunity for Client to earn a reasonable pre-tax profit from the [BLIPS] Investment Program in excess of all associated fees and costs."

[35] Specifically, Vaughn testified representatives from KPMG did not tell him KPMG's opinion letter was predicated on Vaughn's own representations about BLIPs, and that KPMG and Presidio representatives told him there was a reasonable possibility of a pre-tax profit from BLIPS. (However, as noted below, he did "sign off" on representations before receiving the final version of the KPMG opinion letter.) He further stated he did not receive the hundreds of pages of loan documents to be reviewed and signed until a few days before closing. With respect to KPMG's opinion letter, Vaughn stated he did not receive anything until March 23, 2000, when Powell sent him the first ten pages of the opinion letter and requested he "sign off" on them in order to receive the full opinion letter. See Joint Exhibit 17.

[36] Joint Exhibit 17.

In addition, the IRS states Vaughn sought to conceal the BLIPS losses from the IRS by directing Presidio to cause Sill to purchase Euros and Adelphia stock in order to attach most of his tax losses to shares of Adelphia.[37] According to the IRS, the Euros and Adelphia stock were purchased in such a fashion that the tax basis of approximately $40 million could be allocated, once Pilchuck had withdrawn from Sill, 8% to Euros and 92% to a capital asset–the stock.[38] Moreover, the IRS states Vaughn evaded taxes associated with the sale of his company by transferring assets to family members and spending enough to reduce the value of his estate to far less than his taxes.

## DISCUSSION

Section 523(a)(1) provides:

 (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt–

> (1) for a tax or a customs duty--
>
>> (A) of the kind and for the periods specified in section 507(a)(3) or 507(a)(8) of this title, whether or not a claim for such tax was filed or allowed;
>>
>> (B) with respect to which a return, or equivalent report or notice, if required--
>>
>>> (i) was not filed or given; or
>>>
>>> (ii) was filed or given after the date on which such return, report, or notice was last due, under applicable law or under any extension, and after two years before the date of the filing of the petition; or
>>
>> (C) with respect to which the debtor made a fraudulent return or willfully attempted in any manner to evade or defeat such tax. . .[39]

---

[37] See IRS Exhibit HH, Annex A, signed by Vaughn, withdrawing Pilchuck's capital account balance from Sill and directing the purchase of Euros and shares of Adelphia stock.

[38] *Id.*, p.3, Information Sheet containing instructions for allocation of "total notional" of $40,000,000 after withdrawal of Pilchuck from Sill.

[39] 11 U.S.C. § 523(a)(1).

This subsection, to be read in the disjunctive, thus contains two separate exceptions to discharge: 1) for making a fraudulent return; and 2) for willfully attempting to defeat and evade tax.[40] The IRS admits it bears the burden of proving the tax debts should be excepted from discharge by a preponderance of the evidence.[41]

## A.     Filing a Fraudulent Return

This Court can find no cases from the Tenth Circuit Court of Appeals discussing what constitutes a fraudulent return under § 523(a)(1)(C). The issue has been addressed, however, by other courts in this Circuit. These courts have focused on 1) knowledge of the falsehood of the return; 2) an intent to evade taxes; and 3) an underpayment of the taxes, items which have come to be referred to as the *"Krause"* factors.[42] These courts have also set forth additional "badges of fraud" signaling a fraudulent return, including: 1) consistent understatement of income; 2) failure to maintain adequate records; 3) failure to file tax returns; 4) implausible or inconsistent behavior by a debtor; 5) concealing assets; 6) failure to cooperate with taxing authorities; and 7) unreported income from an illegal activity.[43]

The facts set forth above lead to the conclusion Vaughn knew or should have known the returns he filed in 1999 and 2000 contained false information. Specifically, after receiving approximately $34 million in cash and stock from the sale of his company, he invested, through creation of Pilchuk, in a risky and complex transaction promoted by KPMG. He did not conduct his own investigation regarding the nature of the investment nor its tax consequences. Rather, he asserts he relied on the representations of KPMG, of KPMG's attorneys, and of Koo after Koo had reviewed the information supplied by KPMG. Unfortunately for him, Vaughn signed several documents expressly representing he had made an independent investigation. Moreover, he knew, at least by the time he filed the 1999 and 2000 tax returns, the investment was considered suspect by the IRS, and was being investigated. He further acknowledges he now believes the investment had no economic basis.

The evidence makes clear Vaughn was, and is, a sophisticated businessman. What he may lack in formal education, he made up for with hard work, long experience, and intelligence, enabling him to build organizations and eventually create a business which he sold for $2.1 billion. He is a self-made, successful entrepreneur whose accomplishments merit admiration and

---

[40] *See In re Tudisco*, 183 F.3d 133, 137 (2d Cir.1999); *In re Epstein,* 303 B.R. 280 (Bankr. E.D.N.Y. 2004).

[41]  *Grogan v. Garner*, 498 U.S. 279, 291 (1991).

[42] *Wilson v. United States*, 394 B.R. 531, 540-541 (Bankr. D. Colo. 2008), *rev'd in part on other grounds,* 407 B.R. 405 (10th Cir. BAP 2009) *(citing United States v. Krause (In re Krause)*, 386 B.R. 785, 825 (Bankr. D. Kan. 2008) (collecting cases)). *See also In re Fliss*, 339 B.R. 481, 486 (Bankr. N.D. Iowa 2006); *In re Schlesinger*, 290 B.R. 529, 536 (Bankr. E.D. Pa. 2002).

[43] *Krause*, 386 B.R. at 824 (citations omitted).

respect. It is simply not credible such an individual would enter into a transaction like BLIPS without making an independent investigation. Nor it is credible a savvy businessman like Vaughn would not have identified the numerous red flags associated with the transaction–red flags suggesting the investment strategy was not sound and might be an abusive tax shelter.[44]

As his defense, Vaughn seeks to convince this Court he relied on the misrepresentations of others. The Court recognizes KPMG, KPMG's attorneys, and others who may have made representations to Vaughn about BLIPS can certainly be argued to have committed malfeasance. However, it is simply not believable that a man of Vaughn's experience and business acumen would risk endangering what at that time must have been the financial culmination of his career, the $34 million from the sale of his company, without much more personal involvement and a true independent investigation. It is not credible Vaughn could have failed to recognize a representation by KPMG, the promoter of the BLIPS program, or a representation by the lawyers hired by KPMG, might not constitute a truly unbiased opinion or serve as independent investment advice. As the promoter of BLIPS, KPMG and anyone working for KPMG had an inherent conflict of interest when rendering an opinion on BLIPS. Further, even though it stood to gain fees, the attorneys hired by KPMG to issue "opinion letters" only felt comfortable issuing such a letter with the conclusion that BLIPS stood at least a 50% chance of being disallowed by the IRS. For these reasons, the Court finds Vaughn knew or should have known BLIPS-related losses were improper to claim as an offset against taxes he owed on his income from selling his company, thus meeting the first prong of the *Krause* test.

For these same reasons, the Court questions Vaughn's position he viewed BLIPS primarily as an investment versus a tax savings vehicle. According to DeRosa, the IRS's expert witness, BLIPS could not reasonably have generated any gains for investors. DeRosa analyzed the currency transactions engaged in by Sill, and pointed out they had no economic impact. For example, Sill initially bought Euros on a "spot" transaction with the dollars and simultaneously sold the Euros "forward" one month.[45] Such "short forward" transactions simply "washed out" at the U.S. dollar interest rate, and did not constitute meaningful economic transactions because there was no economic risk and the money never left Deutsche Bank. In DeRosa's opinion,

---

[44] Such "warning signals" include the overly complex nature of the Deutsche Bank loan, the reliance on a "loan premium" not contributed by Vaughn to create a tax basis for the investment and KPMG's requirements for Vaughn to state, by signing a draft, that he agreed with KPMG's opinions, before KPMG would issue its actual opinion.

[45] DeRosa explained a spot transaction is one which settles in two bank business days, with the last day, or "settlement day" as the day the currencies are valued. A forward transaction, by contrast, is one where the "settlement day" of the currency to be valued is beyond two days–anywhere from a week to any time in the future. A forward transaction is based on the difference of between one currency and the other, and because of differentials in interest rates, the forward rate cannot equal the spot except if the interest rates in both countries are equal to each other at that moment in time.

there was no prospect of making any money other than interest on such transactions.[46] Sill also obtained "forward" positions with Hong Kong Dollars and Argentine Pesos. DeRosa stated these transactions were really a short-term bet the currencies would collapse and be worth much less in, for example, sixty days, when an investor would be able to buy back U.S. Dollars with significantly less valuable Hong Kong Dollars or Argentine Pesos.

DeRosa opined the problem with this strategy was the Hong Kong Dollar and the Argentine Peso in 1999 were extremely stable, with little to no chance of devaluation or collapse. He noted because the Hong Kong Dollar and the Argentine Peso are "hard pegged" to the U.S. Dollar, they are among the least volatile currencies.[47] They have traditionally been stable even when other currencies fell in value. Therefore, there was virtually no possibility of an economic return on this transaction. To obtain one, according to DeRosa, Vaughn would have had to realize an unrealistic return of 67% on his $2.8 million–in DeRosa's opinion, an impossible hurdle in 60 days.

DeRosa also noted the crippling restrictions placed on Sill by Deutsche Bank in their agreement. The investments Sill could make were extremely limited, and Deutsche Bank, according to DeRosa, could liquidate Sill's positions essentially at will. Deutsche Bank also reduced the possibility of gain by charging fees based on forecasts of Sill's portfolio fluctuation, the so-called "value at risk haircut." Deutsche Bank further retained the right to call the loan if the value of the portfolio dropped below $108,033,750, or 101.25% of the $106.7 million funding amount, which, in DeRosa's opinion, meant Sill could not invest in anything that would make money because it was prevented from taking any risks.[48]

---

[46] DeRosa stated eventually, however, even in this "zero sum" game, interest parity will cost money over time, eroding the original investment. Specifically, according to DeRosa, under John Maynard Keynes's theory of interest parity, there are no free transactions. The "forward" is the same as the "spot" adjusted for the interest rate differential during the term of the transaction. In other words, the "forward" amount will differ from the "spot" amount by the gap in the interest rate–otherwise, an investor could make money simply by switching investments to the highest interest currency. DeRosa stated if an investor is "shorting" a currency like the Hong Kong Dollar or the Argentine Peso, the investor will pay, implicit in the price of the "forward," a higher interest rate than the U.S. Dollar rate, creating a "cost of carry" which eats away at the investor's position over time.

[47] A "pegged" currency means the exchange rate with other currencies is fixed by a country's central bank. Some are called "soft pegs" because the government intends to keep the exchange rate fixed but could change the rate at any time. Some are "hard pegged," which means the central bank of a country keeps on hand enough reserves of foreign currency, usually U.S. dollars, to exchange all of its currency in circulation at a fixed price, and promises to make a market continuously. Two hard pegged currencies, for purposes of this case, were the Hong Kong Dollar and the Argentine Peso.

[48] Moreover, DeRosa noted the cost of leaving the investment after 60 days, even though that was what Vaughn anticipated, was high, due to breakage fees and other penalties. Further, he pointed out the other fees associated with the transaction, including $1.1 million to Presidio and $500,000 to KPMG, did not make sense because an investor who could establish an account with approximately $1 million could have made the same trades without the Sill investment scheme.

Vaughn must have been aware of these "limitations" in light of his experience. Thus the Court finds Vaughn cannot have made the BLIPS investment because he thought it would be a way, even a risky way, to make money. He was simply too smart a businessman for that. Therefore, he must have had another motivation for placing approximately $2.8 million into BLIPS. Based upon the returns he filed, which showed significant tax losses, and based upon his testimony the returns were structured to show a small net capital gain rather than showing the entire amount of BLIPS losses, the Court concludes his motivation in making the BLIPS investment and filing tax returns using the losses from the BLIPS investment was designed to evade taxes on the income from the sale of his company. Accordingly, the second *Krause* prong (intent) is met.

As to the third prong, it should be noted Vaughn himself testified he underpaid the taxes, and has repeatedly expressed his intention to pay them. His dispute is with the assertion he knew of the impropriety of the BLIPS investment at the time it was made, or at the time he filed his 2004 amendment to his 1999 return. He contends he did not know of the true nature of the investment until much later. Because the Court finds, as described above, he knew or should have known about the problems with BLIPS at the time of the investment, the Court concludes this argument lacks merit. In addition, when he filed his amended 1999 return in 2004, he was aware KPMG was under investigation, and Mr. Lees told him in early 2001 the BLIPS losses would be disallowed. Therefore, the taxes were clearly underpaid and the third prong of the *Krause* test has been met.

The Court notes the other "badges of fraud" signaling a fraudulent return set forth in *Krause*, such as failure to keep records and failure to file returns, are not present. However, the "badge" of implausible and inconsistent behavior exists. Vaughn's general investment manager, Robert Mueller, with whom he placed other investments, described Vaughn as a conservative investor who had never shown any interest in or knowledge of foreign currency based investments.[49] Thus, Vaughn's actions involving the BLIPS investment were inconsistent both with his other investment behaviors, and were both implausible and inconsistent with his business acumen and purported investment goals.

**B.    Willful Evasion**

The most recent appellate decision addressing § 523(a)(1)(C) identified two components to a showing of willful evasion: 1) a conduct requirement; and 2) a mental state requirement.[50] The Court stated:

---

[49] Mueller Deposition, p. 32, lines 19-20, and p. 36, lines 13-25.

[50] *United States v. Storey*, 640 F.3d 739, 744 (6th Cir. 2011). *See also United States v. Jacobs, ( In re Jacobs )*, 490 F.3d 913, 921 (11th Cir. 2007); *United States v. Fegeley (In re Fegeley)*, 118 F.3d 979, 983 (3rd Cir. 2000).

> To satisfy the conduct requirement, the government must demonstrate that the debtor avoided or evaded payment or collection of taxes through acts of omission, such as failure to file returns and failure to pay taxes, or through acts of commission, such as affirmative acts of evasion. Non-payment of tax alone is not sufficient to bar discharge of a tax obligation, but it is a relevant consideration in the overall analysis.
> . . . .
>
> [In addition] non-dischargeability under 523(a)(1)(C) requires a "voluntary, conscious, and intentional evasion." The government must prove that the debtor 1) had a duty to pay taxes, 2) knew she had a duty, and 3) voluntarily and intentionally violated that duty.[51]

*1.  Conduct*

A recent case observed when a debtor affirmatively acted to avoid payment or collection of taxes, whether through commission or omission, these actions satisfy the conduct requirement of willful evasion of tax.[52] The *Hawkins* court noted: "[L]arge discretionary expenditures, combined with nonpayment of a known tax, contribute to the conduct analysis. Moreover, nonpayment of a tax can satisfy the conduct requirement when paired with even a single additional culpable act or omission."[53] The *Hawkins* court went on to affirm the bankruptcy court's finding a debtor met the conduct requirement of § 523(a)(1)(C) where he made "unreasonable and unnecessary discretionary expenditures at a time when he knew he owed taxes and knew he would be unable to pay those taxes."[54]

Here, Vaughn admitted as of June 2001, he knew Koo was subject to an IRS audit regarding the BLIPS transaction. In addition, by January 2001, he was informed of the IRS notice questioning the validity of BLIPS by receiving a copy of the Notice 2000-44. He was also in possession of the opinion letter indicating he could be subject to an audit on the same basis. He therefore knew he had a potential liability on the full amount of his gain from the Frontier Vision sale. Nonetheless, although he had transferred approximately one-half of his post-Frontier Vision sale assets to Cindy Vaughn as part of their divorce settlement, he failed to take any actions to preserve his remaining assets for the payment of additional taxes.

Specifically, he purchased a $1.7 million home in Evergreen, Colorado, but put the title in the sole name of his then-fiancee, Kathy St. Onge ("St. Onge"). Moreover, shortly before

---

[51] *Storey*, 640 F.3d at 744-745 (citations omitted).

[52] *Hawkins v. Franchise Tax Bd.*, 447 B.R. 291, 301 (N.D. Cal. 2011) (citing *Jacobs*, 490 F.3d at 921).

[53] *Id.*, at 301-302 (citing *Jacobs*, 490 F.3d at 926–27; *Gardner*, 360 F.3d at 560–61; *Fegeley*, 118 F.3d at 984; *United States v. Fretz (In re Fretz)*, 244 F.3d 1323, 1329–30, *Toti v. United States (In re Toti)*, 24 F.3d 806, 809 (6th Cir. 1994)).

[54] *Id.*, at 302.

disclosing his participation in BLIPS to the IRS, Vaughn created and funded a $1.5 million trust for his stepdaughter, Stephanie Frank ("Frank"). In addition, after Vaughn married St. Onge in October, 2001, St. Onge obtained funds of approximately $97,000 from the couple's accounts, spent funds to decorate the Evergreen home, and spent $42,000 on jewelry.[55] Between 2002 and 2003, Vaughn himself spent approximately $20,000 on jewelry.[56] Even if Vaughn himself did not retain access to the funds he spent after knowing of his large potential tax liability, his transfers ensured funds would not be available to satisfy his tax obligations.

   *2.    Mental State*

The *Jacobs* and *Hawkins* courts also summarize the case law interpreting the mental state component of willful evasion, noting the requirement is satisfied where the government shows the following three elements: 1) the debtor had a duty under the law; 2) the debtor knew he had the duty; and 3) the debtor voluntarily and intentionally violated the duty.[57] The government does not need to demonstrate fraudulent intent, but only that a debtor acted "knowingly and deliberately."[58]

Similarly, the Tenth Circuit has held a debtor's actions are willful under § 523(a)(1)(C) if they are done voluntarily, consciously, or knowingly and intentionally.[59] It agrees with other courts that more than non-payment of one's taxes is required to establish a willful evasion.[60] However, the Tenth Circuit also noted concealment of assets to avoid payment or collection of taxes may constitute a willful evasion.[61] Indeed, the Tenth Circuit recognized "Congress did not define or limit the methods by which a willful attempt to defeat and evade might be accomplished. . . ."[62] The Court also stated:

> By way of illustration, and not by way of limitation, we would think affirmative willful attempt may be inferred from conduct such as keeping a double set of books, making false entries or alterations, or false invoices or documents, destruction of books or records, concealment of assets or covering up sources of income, handling

---

[55] IRS Exhibit KKK.

[56] IRS Exhibit NNN.

[57] *Id.*, at 300; *Jacobs*, 490 F.3d at 921.

[58] *United States v Mitchell (In re Mitchell)*, 633 F.3d 1319, 1328 (6th Cir. 2011).

[59] *Dalton v. Internal Revenue Service*, 77 F.3d 1297, 1302 (10th Cir. 1996) (citing *Toti*, 24 F.3d at 809).

[60] *Id.*, at 1307.

[61] *Id.*

[62] *Id.* at 1301.

>of one's affairs to avoid making the records usual in transactions of the kind, and any conduct, the likely effect of which would be to mislead or to conceal.[63]

In addition, the United States District Court for the District of Massachusetts observed:

>Conduct that constitutes circumstantial evidence of a debtor's willful intent to evade taxes includes: 1) implausible or inconsistent explanations of behavior, 2) inadequate financial records, 3) transfers of assets that greatly reduce assets subject to IRS execution and 4) transfers made in the face of serious financial difficulties.[64]

In this case, as noted above, Vaughn exhibited behavior which was inconsistent with his business acumen and was implausible based on that acumen when he participated in the BLIPS investment. Further, by purchasing expensive homes, automobiles, and jewelry, following a divorce which significantly depleted his assets, he further demonstrated such inconsistent and implausible behavior. That is, knowing, as he must have, the BLIPS investment constituted an improper abusive tax shelter with no economic basis and no reasonable expectation of profit, he nonetheless continued to spend as if there would be no additional tax to pay. This is simply not logical, unless he had another motive for such spending.

The evidence before the Court not only demonstrates he spent the funds and made the transfers in the face of serious financial difficulties, but also indicates his motive in doing so was to reduce assets subject to potential IRS execution. In short, by transferring funds and assets to St. Onge and Frank, he attempted to take those funds and assets out of the reach of the IRS. The Court does not deny Vaughn may have had some altruistic goals in setting up a trust for Frank, and may have had some good intentions for transferring real property to and purchasing real property for St. Onge, but any such motivations are overshadowed and outweighed by the fact Vaughn knew of the impending tax debt, and took no reasonable actions to preserve assets to pay it.

In order to meet the requirements of § 523(a)(1)(C), a debtor need not exhibit fraud or an evil motive. Rather, choosing to satisfy other obligations or pay for non-essentials, while not paying taxes, sufficiently demonstrates intent to evade tax.[65] The United States District Court for the Northern District of California, in affirming the *Hawkins* decision, stated:

---

[63] *Id.*, at 1301.

[64] *United States v. Beninati*, 438 B.R. 755, 758 (D. Mass. 2010) (citations omitted). *See also, Geiger v. Internal Revenue Service (In re Geiger)*, 408 B.R. 788, 791 (C.D. Ill. 2009) (citations omitted).

[65] *Hawkins v. Franchise Tax Board (In re Hawkins)*, 430 B.R. 225, 235 (Bankr. N. D. Cal. 2010), *aff'd.*, 447 B.R. 291 (N.D. Cal. 2011) (citing *Lynch v. U.S. (In re Lynch )*, 299 B.R. 62, 64 (Bankr. S.D.N.Y. 2003); *Jacobs*, 490 F.3d at 925–27; *Stamper v. United States, (In re Gardner )*, 360 F.3d 551, 560–61 (6th Cir. 2004); *Wright v. United States (In re Wright)*, 191 B.R. 291, 293 (S.D.N.Y. 1995); *Hamm v. United States (In re Hamm)*, 356 B.R. 263, 285–86 (Bankr. S.D. Fla. 2006)).

> This statement adequately places debtors on notice that their decision to prioritize other obligations or make non-essential purchases, rather than pay a known tax debt, can render their tax debts nondischargeable. Following the reasoning of other courts that have addressed the issue, the Court adopts this standard and affirms the bankruptcy court's conclusion that unnecessary expenditures combined with nonpayment of a known tax constitutes a willful attempt under Section 523(a)(1)(C).[66]

This Court agrees with the reasoning set forth in these cases. Therefore, the Court finds Vaughn's actions meet the state of mind test to show intent to evade tax.

## CONCLUSION

Throughout this case, Vaughn has argued he is an innocent victim of the machinations and misrepresentations of KPMG and persons in the employ of or hired by KPMG. This Court does not disagree that such machinations and misrepresentations took place. However, a taxpayer cannot reasonably rely on the advice of a professional who has an inherent conflict of interest, such as the promoter or marketer of a tax investment.[67] KPMG, its employees, and even the law firm employed by KPMG to issue "opinion letters" had such a conflict, because KPMG was the marketer of the BLIPS investment. It is simply not credible that an individual of Vaughn's extensive business background and demonstrated business skill would have reasonably relied on any such representations, and would not have, if he were seriously considering BLIPS as a legitimate investment, obtained a truly independent opinion as to its potential and its tax implications.

For these reasons,

IT IS ORDERED Vaughn's tax debts arising from the sale of Frontier Vision are not dischargeable under 11 U.S.C. § 523(a)(1)(C).

Dated December 28, 2011

BY THE COURT:

Michael E. Romero
U.S. Bankruptcy Judge

---

[66] *Hawkins*, *supra*, 447 B.R. at 297.

[67] *See Goldman v. C.I.R.*, 39 F.3d 402, 408 (2nd Cir. 1994) (taxpayers "cannot reasonably rely for professional advice on someone they know to be burdened with an inherent conflict of interest.").